UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ZAMARIA METCALF, | |
| Plaintiff, | Case No. 21-12242 |
| | Honorable Shalina D. Kumar |
| v. | Magistrate Judge David R. Grand |
| | |
| STATE OF MICHIGAN et al., | |
| Defendants. | |

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 63, 65) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 60)

## I.      Introduction

Plaintiff Zamaria Metcalf ("Metcalf") is a quadriplegic woman who wishes to become a foster parent. The Michigan Department of Health and Human Services ("MDHHS") rejected her application to serve as a foster parent and Metcalf alleges that "[s]he was denied for the sole reason that she has a physical disability." ECF No. 42, PageID.716. Metcalf asserts the denial constitutes disability discrimination in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-34, Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id.* She also alleges that the state statutes and rules

governing foster home licensing discriminate on their face against applicants with disabilities in violation of the ADA and Section 504. *Id.* at PageID.726-29. Metcalf seeks a declaration that the applicable Michigan laws and implementing regulations, to the extent they exclude persons with disabilities from becoming foster parents by reason of their disability, violate the ADA and Section 504 and are therefore invalid and unenforceable. She also seeks an order enjoining defendants from excluding her from access to the foster care licensing system because of her disability, as well as punitive damages, compensatory damages, and attorney fees and costs.

After a series of dismissals and amendments, the defendants currently are: (1) the State of Michigan ("State"); (2) Patricia Neitman ("Neitman"), the former Director of MDHHS's Division of Child Welfare Licensing ("DCWL"); (3) Ashleigh Brotherson[1] ("Brotherson"), the current Director of MDHHS's DCWL; (4) the Ennis Center for Children Inc. ("Ennis") a state-contracted agency that performs home placement studies for MDHHS and makes recommendations as to whether MDHHS should approve or deny foster care licensing applications; (5) Ashley Curtis ("Curtis"), the Ennis employee who conducted Metcalf's home placement study and recommended MDHHS deny her application; and (6) Stephanie

---

[1] Brotherson's last name has since changed to LaPointe.

Miller ("Miller"), the Ennis supervisor who signed off on Curtis's study and recommendation. ECF No. 42. The State, Neitman, and Brotherson are collectively referred to as the "State Defendants." Ennis, Curtis, and Miller are collectively referred to as the "Ennis Defendants."

Metcalf's remaining claims are: (1) disability discrimination in violation of the ADA against the State, Ennis, and Neitman in her official capacity; (2) disability discrimination in violation of Section 504 against the State, Ennis, and Neitman and Brotherson in their official capacities; (3) the facial challenge to the state statutes and rules governing foster home licensing against the State, and Neitman and Brotherson in their official capacities; and (4) violations of the Equal Protection Clause against Ennis, and Neitman, Curtis, and Miller in their individual capacities. ECF No. 42.

Metcalf moved for summary judgment on September 3, 2024. ECF No. 60. The Ennis and State defendants filed cross motions for summary judgment. ECF Nos. 63, 65. The motions are fully briefed. ECF Nos. 60, 63, 64, 65, 66, 71, 72, 73, 74, 75, 77. The Court heard oral argument on September 3, 2025. ECF No. 78.

For the following reasons, the Court grants the Ennis and State Defendants' motions for summary judgment (ECF Nos. 63, 65) and denies Metcalf's motion for summary judgment. ECF No. 60.

## II.    Factual Background

Metcalf is a quadriplegic who is paralyzed from the neck down due to injuries she sustained when she was in a car accident approximately twenty years ago. She can move her left arm and moves around with the help of a powered wheelchair. Metcalf manages her household, but she is reliant on full time, 24/7 assistants to perform physical tasks. ECF No. 60, PageID.877. Metcalf is, as her complaint describes, the "brains of the operation," and her assistants act as her hands. ECF No. 42, PageID.719. Metcalf's health assistants are paid for by her no-fault automobile insurance policy as a result of her accident. ECF No. 60, PageID.877.

The dispute arises from Metcalf's desire to become a foster parent. Metcalf states that her passion is childcare and being a foster parent is a familiar role in her family. She claims that children, including her niece and nephew, have lived in her home at various times and she has babysat children on a regular basis. ECF No. 60, PageID.878. Although she managed the care of the children in her home, she relied upon her assistants to perform physical tasks on her behalf. ECF No. 60, PageID.879. Metcalf set her sights on becoming a licensed foster parent and applied for a Michigan Foster Care license on July 31, 2019, after completing initial orientation, online first aid training, and the required

background check. ECF No. 42, PageID.719, ¶ 18; ECF No. 60-3, PageID.1218-30.

MDHHS is the agency that administers the State's foster care management and adoptive services programs. *Id.* at ¶ 19. The Michigan Child Care Organizations Act ("the Act"), M.C.L. 722.111 *et seq.*, requires MDHHS to promulgate and enforce rules for the care and protection of children in foster care homes, including the requirements for licensing prospective foster homes. Pursuant to this mandate, MDHHS and its subdivision, DCWL, which oversees the evaluation and licensing of prospective foster family homes, issued comprehensive rules governing the licensure of foster homes. *See* Mich. Admin. Code R. 400.9101-400.9506. These rules establish requirements for who may become a foster parent and for the agencies evaluating foster parent applications. *See, e.g.*, Mich. Admin. Code R. 400.9201. The Act also permits MDHHS to authorize a private child placing agency, like Ennis, to investigate prospective foster family homes, certify whether the homes meet state licensing requirements, and recommend whether MDHHS should approve their application. M.C.L. 722.115. Before certifying to MDHHS that a foster family home meets the requirements, the child placing agency must "receive and review a medical

statement for each member of the household indicating that he or she does not have a known condition that would affect the care of a foster child." *Id.*

MDHHS received Metcalf's application and referred it to Ennis. When MDHHS refers an application to Ennis for evaluation, an Ennis employee conducts the home study, produces a report, and makes a recommendation to MDHHS based on the home evaluations, supporting documentation, physical examination reports, and other relevant information as to whether the applicant should be granted a license under the applicable regulations and administrative code. ECF No. 63, PageID.1490-91. MDHHS is then free to issue or deny the license as it sees fit; it is not bound by Ennis' recommendation. *Id.* at PageID.1490.

Ashley Curtis, an employee of the Ennis Center, completed Metcalf's two home visits and spoke to Metcalf on several occasions from May 2019 through October 2019. *Id.* at PageID.1491; ECF No. 60-3, 1238-39, 1256. In September 2019, Metcalf's physician, Dr. Neil Friedman, completed a physical examination form pursuant to M.C.L. 722.115(3), where he opined that Metcalf had physical or mental factors that would jeopardize the physical or mental welfare of any children placed in her family for foster care and/or adoption, and noted that she "is paralyzed from the shoulders down. She has no functional use of arms or legs." ECF No. 60-3,

PageID.1235. Curtis then completed the Initial Foster/Adoption Home
Evaluation Report ("Report") on December 4, 2019, which was signed off
by Curtis' supervisor, Miller. ECF No. 60-3, PageID.1238-55. The Report
consists of nineteen sections, each containing multiple subparts. *Id.*
However, in Metcalf's case, Curtis skipped most of the questions. In
response to at least seventy (70) items on the home study form, Curtis'
report notes: "this section was not assessed by the worker as the licensing
recommendation for Ms. Metcalf is denial." *Id.* Curtis recommend denial of
Metcalf's foster home license application, stating that "the recommendation
of denial is based on the physical examination documentation received
from Ms. Metcalf's medical physician and the worker's observation and
interview with Ms. Metcalf." *Id.* at PageID.1254. Curtis concluded that
licensing Metcalf would violate four specific state regulatory provisions:
Michigan Administrative Code Rules 400.9201(d), (h), and (j), and Rule
400.9202(1)(b).

Michigan Administrative Code Rules 400.9201(d), (h), and (j) require,
respectively, that a foster home applicant must "[d]emonstrate an
understanding of the care which must be provided to the children served by
the agency", "[b]e of such physical, mental, and emotional health to assure
appropriate care of children", and "[b]e of responsible character and be

suitable and able to meet the needs of children and provide for their care, supervision, and protection." Mich. Admin. Code R. 400.9201(d), (h), & (j). Rule 400.9202(1) provides that, "to assure the safety and welfare of a foster child, a member of the household shall meet all of the following qualifications: . . . (b) Be in a state of physical, mental, and emotional health that will not impair the care of a foster child." Mich. Admin. Code R. 400.9202(1). Curtis concluded Metcalf was in noncompliance with these licensing rules and recommended denial of her foster home license application as a result. ECF No. 60-3, PageID.1256-60. On February 20, 2020, Neitman reviewed the Ennis Report and, on behalf of MDHHS, agreed that Metcalf was not in compliance with licensing standards and administratively closed her application for the reasons stated therein. *Id.* at PageID.1262.

Metcalf filed this lawsuit on September 23, 2021. ECF No. 1. Defendants moved to dismiss Metcalf's initial complaint in 2022. ECF Nos. 16, 17. The Court granted in part and denied the defendants' respective motions—dismissing Metcalf's Equal Protection claims against all defendants and dismissing Metcalf's facial challenge to the state statutes and rules without prejudice and denying defendants' motions in all other respects. ECF No. 23. Metcalf subsequently filed two amended complaints,

with the Second Amended Complaint being the operative one for purposes of the present motions. ECF No. 42. Metcalf removed MDHHS as a defendant and added Ashleigh Brotherson, the current Director of MDHHS's Division of Childcare Licensing, as a defendant, and replead her dismissed Equal Protection and facial challenge claims. ECF No. 42.

## III.   Standard of Review

Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516–17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)). In reviewing a motion for summary judgment, courts are to "view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Williams v. Mauer*, 9 F.4th 416, 430 (6th Cir. 2021) (citation omitted). The ultimate question for the court to determine "is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pham. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"When, as here, there are cross-motions for summary judgment, the Court considers them separately, and it is not necessary that either party is entitled to summary judgment; it is possible that neither party meets its burden." *Peatross v. Liberty Mutual Personal Ins. Co.*, 575 F. Supp. 3d 887, 891 (E.D. Mich. 2021) (citing *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021)). When considering the plaintiff's motion, the evidence is viewed in the light most favorable to the defendant and the burden is on the plaintiff to show that he is entitled to judgment as a matter of law. *Id*. The opposite is true when considering the defendant's motion. *Id*.

## IV.    Ennis and State Defendants' Motions for Summary Judgment

### A. Discovery Issues

As an initial matter, Metcalf asks the court to disregard the affidavits of Neitman and Curtis submitted in support of defendants' respective motions, claiming that these affidavits were responsive to her interrogatories and that defendants failed to supplement responses in violation of Federal Rule of Civil Procedure 37(c)(1). ECF No. 73, PageID.2157-61. The Court denies this request. Metcalf takes issue with the fact that these affidavits were not disclosed during discovery but fails to

account for the fact that these affidavits were created within days of defendants' respective motions for summary judgment. ECF Nos. 63-3, 65-2. Nothing in Federal Rule of Civil Procedure 56 prohibits a party from creating an affidavit to support or oppose a motion for summary judgment. Moreover, despite Curtis and Neitman being named defendants in her lawsuit, and the discovery responses naming them as potential witnesses, Metcalf did not pursue their depositions or file a motion to compel discovery under Federal Rule of Civil Procedure 37 when defendants objected to her interrogatories. *See* ECF No. 66-2, PageID.1999; ECF No. 50. The Court does not find that defendants violated discovery and will consider the affidavits accordingly.

### B. Metcalf's ADA and Section 504 Claims

The State and Ennis defendants move for summary judgment on Metcalf's statutory discrimination claims under Title II of the ADA and Section 504. Both statutes prohibit public or federally funded entities from discriminating against disabled individuals while operating services or programs. *Knox County v. M.Q.*, 62 F.4th 978, 999–1000 (6th Cir. 2023). Courts generally assess ADA and Section 504 claims together due to their similarities. *Id.* at 1000. "To prevail under either statute, a plaintiff must establish that: (1) she has a qualifying disability, (2) she is otherwise

qualified for a program, and (3) she was excluded from participation in, denied the benefits of, or subjected to discrimination under a program because of her disability." *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024) (citation omitted). Under the third prong, a plaintiff may allege disability discrimination under two theories: failure to reasonably accommodate, and intentional discrimination. *Id.* (citing *Knox*, 62 F.4th at 1000). Metcalf brings claims under both theories. She first argues that the State defendants and Ennis failed to reasonably accommodate her disability because they did not consider her aides' abilities to perform the physical tasks associated with being a foster parent as an accommodation, thus depriving her of an individualized inquiry prior to denying her application. ECF No. 60, PageID.897-901. She also alleges that the State and Ennis intentionally discriminated against her by denying her a foster home license because of her disability. *Id.* at 906-08.

### 1. Failure to Accommodate

The Court first addresses Metcalf's failure to accommodate claim. Metcalf must establish "that [s]he (1) is disabled under the statutes, (2) is 'otherwise qualified' for participation in the program, [ ] (3) 'is being excluded from participation in, denied the benefits of, or subjected to discrimination' because of h[er] disability or handicap, and (4) (for the

Rehabilitation Act) that the program receives federal financial assistance."
*Gohl v. Livonia Pub. Schs.*, 836 F.3d 672, 682 (6th Cir. 2016) (citation
omitted). "A handicapped or disabled person is 'otherwise qualified' to
participate in a program if she can meet its necessary requirements with
reasonable accommodation." *Kaltenberger v. Ohio Coll. of Podiatric Med.*,
162 F.3d 432, 435 (6th Cir. 1998) (citation omitted). The plaintiff bears the
burden of demonstrating that she is qualified by "proposing an
accommodation and proving that it is reasonable, including establishing
that [s]he can meet a program's necessary requirements with that
accommodation." *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th
Cir. 2015) (quoting *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th
Cir. 2010); *Kaltenberger*, 162 F.3d at 435) (internal quotation marks
omitted).

The parties dispute whether Metcalf was "otherwise qualified" to
participate in the foster care licensure program with or without an
accommodation, if she requested an accommodation, and if her proposed
accommodation would fundamentally alter the purpose of the State's
licensure program. The Court will address each in turn.

### a. Did Metcalf Request an Accommodation?

Before the Court addresses whether Metcalf was otherwise qualified for licensure, it must assess whether she requested an accommodation in the first place. The State and Ennis defendants argue that Metcalf did not request that the aids be considered an accommodation when she applied for licensure. ECF No. 65, PageID.1896, ¶ 21; ECF No. 63-3, PageID.1528, ¶ 22. Ennis also points to Metcalf's testimony, where she states that she did not submit a proposed accommodation or create a list of household duties and assistance items for her aides as it relates to the care of foster children in anticipation of becoming a foster parent. ECF No. 63-4, PageID.1571-73. Nor did she ask Dr. Friedman's opinion if she could meet licensure requirements with her assistants. ECF No. 63-5, PageID.1591.

"[A] covered entity is generally not liable for failing to make reasonable accommodation if the plaintiff did not request accommodation or otherwise alert the covered entity to the need for accommodation." *Marble v. Tennessee*, 767 F. App'x. 647, 652 (6th Cir. 2019). It is the plaintiff's responsibility to inform the entity that they require an accommodation. *Id.* But "this rule of thumb may not be absolute." *Id.* at 652 n.2. If, for instance, the individual's needs are "obvious," that individual's "failure to expressly 'request' an accommodation . . . is not fatal to an ADA claim [because] the defendant otherwise had knowledge of an individual's

disability needs, but took no action." *McCoy v. Tex. Dep't of Crim. Justice*,
2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) (collecting cases); *see* 29
C.F.R. § 1630.9(a) ("It is unlawful for a covered entity not to make
reasonable accommodation to the *known* physical or mental limitations of
an otherwise qualified applicant or employee with a disability....") (emphasis
added). "It is true that a disabled individual is not required to use the
specific words 'disability' or 'accommodation,' and a covered entity may
need to infer that a request is a request for accommodation if context'
shows that it is meant to compensate for medical restrictions." *Marble,* 767
F. App'x at 653 (citing *Leeds v. Potter*, 249 F. App'x 442, 450 (6th Cir.
2017)). "But the 'context' of the request must be clear enough that the
[defendant] can infer that the purpose of a request for a particular benefit is
to accommodate 'medical restrictions.'" *Id.* (citing *Smith v. Henderson*, 376
F.3d 529, 535 (6th Cir. 2004)) (alternations in original).

The State and Ennis defendants argue that Metcalf failed to meet her
burden of proposing a reasonable accommodation and that there is no
evidence that she asked for a specific accommodation. Curtis' testimony
supports this point, stating that: (1) "Ms. Metcalf never requested any type
of accommodation for her disability . . . .;" and (2) "Ms. Metcalf never
requested that her aids assist her with caring for the foster children and

never made such a request within her application." ECF No. 63-3, PageID.1529, ¶¶ 22, 23. Indeed, Metcalf also testified that she did not make any formal requests for an accommodation seeking to have her assistants recognized as part of her foster care application because she "did not know that [she] could or had to." ECF No. 63-4, PageID.1554. Nevertheless, Metcalf argues that the State's duty to accommodate her was prompted by the obviousness of her disability, as Curtis observed Metcalf's reliance of aids to perform physical tasks during the home study. ECF No. 72, PageID.2139. Metcalf testified that her need for an accommodation was also apparent from her conversation with Curtis. For example, in response to whether she ever specifically requested that adaptive aid from Ennis, Metcalf testified that:

> I did ask the Ennis Center would my staff need to be foster care – would they have to take the foster care classes, or would they just be able to do the first-aid and CPR. And that – that is, I didn't necessarily say, hey, can you recognize my staff as an adaptive aid, or, I was just try to see, what they need to have . . . So I was just asking for that, hey, these people are in my home, they're going to be helping me, they're going to be assisting me with the children. Because at the end of the day, that's what is going on. They're assisting me with the children. I feel that I am taking care of the children. I'm just asking them, hey, do they need to be, you know, certified, or can they just do CPR, first aid, because that physically is what I really cannot do, the CPR and the first aid. And it is a requirement of the foster parent.

ECF No. 60-9, PageID.1441-1442, 152:5-153:3.

Admittedly, this is a close call, but when viewing the evidence in a light most favorable to Metcalf, a reasonable jury could find that Metcalf's conversation with Curtis was clear enough to infer an accommodation request, and that Metcalf's need for an accommodation was obvious because she is a quadriplegic that relies on aids to perform physical tasks. *Marble*, 767 F. App'x. at 653. Furthermore, a reasonable jury could also find that the State inferred an accommodation request when it reviewed Ennis' Report because Neitman testified that she inquired into whether Metcalf's aides could provide for children in the home, and it determined that it would be an inappropriate accommodation. ECF No. 65-2, PageID.1930, ¶ 9.

### b. Was Metcalf "Otherwise Qualified" for Licensure

On the second element, the State and Ennis defendants argue that Metcalf was not "otherwise qualified" for a foster family home license because: (1) utilizing her home health aides to perform physical tasks associated with being a foster parent is not a reasonable accommodation; and (2) even if her accommodation was reasonable, she did not meet the requirements set forth in the Child Care Organizations Act ("CCOA"), M.C.L. 722.111, *et seq.*, and the administrative rules for foster family homes.

Metcalf is "otherwise qualified" to participate in the foster care licensure program if she can meet its necessary requirements with a reasonable accommodation. *Clemons v. Shelby Cty. Bd. of Educ.*, 818 F. App'x 453, 464 (6th Cir. 2020) (internal quotations and citations omitted). "The plaintiff bears the burden of demonstrating that [she] is qualified by proposing an accommodation and proving that it is reasonable, including establishing that he can meet a program's necessary requirements with that accommodation." *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 839 (6th Cir. 2018) (internal quotation and citation omitted); *see also Knox,* 62 F.4th at 1000. "[P]laintiffs are not entitled to their preferred accommodations, but merely a reasonable one that provides meaningful access to the public entity." *Finley*, 102 F.4th at 825 (quoting *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023)) (cleaned up). "Implementing regulations do not require governmental entities to make such accommodations if doing so 'would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.'" *Id.* (quoting 28 C.F.R. § 35.150(a)(3)). Determining whether a particular accommodation is reasonable is "highly fact-specific, requiring case-by-case inquiry." *Id.* at 825–26 (citations omitted).

The CCOA requires a prospective licensee to provide "a medical statement for each member of the household indicating that he or she does not have a known condition that would affect the care of a foster child. M.C.L. 722.115(3); *see also* Mich. Admin. Code. R. 400.9206(c)(iii) (requiring the prospective licensee to provide the agency with "[a] medical statement that includes all treatments, prescriptions, and medications for each member of the household that indicates the member has no known condition which would affect the care of a foster child."). M.C.L. 722.115(3) requires the medical statement to be "signed and dated by a physician . . . a physician's assistant . . . or a certified nurse practitioner licensed as a registered professional nurse . . . ." Lastly, "[a] foster home applicant or licensee must . . . [h]ave the physical, mental, and emotional health to ensure appropriate care of the children. Mich. Admin. Code R. 400.9201(1)(d).

Without a reasonable accommodation, Metcalf was not qualified to obtain a foster care license. The reasons for recommending denying Metcalf licensure was Ennis finding Metcalf to be noncompliant under M.C.L 722.115(3) and several provisions of the Michigan Administrative Code, 400.9201 *et al*, specifically: 9201(d) ("Understanding of the care"), 9201(h) ("Be of such physical health, mental, and emotional health to

assure appropriate care of children"), 9201(j) ("Be of responsible character and be suitable and able to meet the needs children and provide for their care, supervision, and protection"), and 9202(b) ("Be in a state of physical, mental, and emotional health that will not impair the care of a foster child"). ECF No. 60-3; *see also* ECF No. 65-2, PageID.1929, ¶ 7.[2] Specifically, Ennis recommended denying Metcalf's license due to defendant Curtis' observations and interview with Metcalf and Doctor Friedman's medical statement:

> Ultimately, due to Ms. Metcalf's need to rely solely on her care from others, at this time it has been assessed that she is unable to appropriately care for potential foster/adoptive children. Ms. Metcalf's medical professional has also documented his concerns regarding her physical ability to appropriately care for potential foster/adoptive children.

ECF No. 60-3, PageID.1253. Curtis testified that she recommended denying Metcalf's application "as a result of the medical opinion and conclusions from Ms. Metcalf's treating physician that Ms. Metcalf was physically unable to care for a foster or adoptive child, and that placing a foster or adoptive child would jeopardize the physical or mental welfare of

---

[2] It is undisputed that Ennis did not completely fill out the evaluation and used a uniform response for a substantial part of the evaluation. Metcalf claims that this is, in and of itself, discriminatory.

any child placed with Ms. Metcalf for foster care and/or adoption." ECF No.

63-3, PageID.1528.

For context, Dr. Friedman has treated Metcalf for her spinal cord

injury for over a decade. On September 3, 2019, Dr. Friedman noted on a

prescription pad that "Ms. Metcalf has a spinal cord injury and is paralyzed

from the shoulder down. She has severely impaired physical mobility. I

believe her mental/cognitive function is intact." ECF No. 60-3,

PageID.1237. On September 9, 2019, Dr. Friedman completed the required

physical examination form and checked "yes" to the following questions,

indicating that:

> (1) Metcalf suffers from an illness that would be detrimental to
> the care of a foster child/adoptive child placed in her home;
> (2) Metcalf has chronic or serious disorders for which she has
> been or is receiving treatment;
> (3) Metcalf experiences physical, behavioral or emotional
> problems that would be detrimental to a foster child/adoptive
> child placed in the home; and

*Id.* at PageID.1235. Dr. Friedman marked that physical or mental factors

would jeopardize the welfare of any foster or adoptive child placed with her,

noting that "Metcalf is paralyzed from shoulders down. She has no

functional use of arms or legs." *Id.* He explained that Metcalf is a

quadriplegic and not physically capable of caring for another person,

stating that "[s]he cannot even care for herself." ECF No. 60-8,

PageID.1386. When asked if it was his medical opinion if Metcalf is capable of emotionally, mentally, or behaviorally caring for a child, Friedman testified "[a]s far as I'm aware, yes, but I'm not qualified to evaluate her psychiatric or emotional status." *Id.*

Curtis also interviewed Metcalf during the home visit, at which time Metcalf reported that she requires 24/7 care and supervision, that her niece, nephew, and family members assist with her care, that a caregiver typically cooks all of the meals, that a caregiver accompanies her everywhere she goes, and that Metcalf indicated that her caregivers would assist her if physical interaction or intervention is needed with a foster child. ECF No. 60-3, PageID.1253.

Additionally, Metcalf testified that her disability prevents her from driving, cleaning, cooking, doing laundry, bathing herself and children, or getting into bed. ECF No. 60-9. She uses twenty-four-hour home health aides to perform the physical tasks in the home. ECF No. 60, PageID.877 (citing ECF No. 60-8). The testimony of her niece and nephew—who lived with Metcalf for several years—also demonstrates that Metcalf was reliant on her aides and family members to handle physical tasks such as driving, cooking, changing diapers, bathing, and using the bathroom. ECF No. 63-12, PageID.1655-66; ECF No. 60-6, PageID.1329-33.

The State argues that even if Metcalf proposed a reasonable accommodation for her disability, she would still not be "otherwise qualified" because she cannot demonstrate that she would have met the various other requirements for licensure pursuant to the CCOA and the administrative rules for foster family homes. To support its position, it cited Ennis' Report, which noted Metcalf's CPS history, one missing smoke detector, and the absence of an emergency procedures plan—violations of Mich. Admin. Code R. 400.9201, 9206, 9304, 9411. ECF No. 60-3. In response, Metcalf claims that she could have easily completed the emergency preparedness plan and installed a smoke detector if she was not denied because of her disability. ECF No. 72, PageID.2134. She also argues that the CPS investigation was not dispositive to her ability to be licensed because it was not mentioned thereafter, and as it relates to this investigation, Metcalf testified that she has never been personally investigated by CPS but interviewed with CPS on two occasions relating to other people. *Id.*; *see also* ECF No. 60-9, PageID.1410-11. Moreover, Metcalf points to her testimony to demonstrate that she is financially capable of supporting a foster child. ECF No. 72, PageID.2130, ¶ 1.

Viewing the evidence in the light most favorable to Metcalf, her unsupported assertions that she could have "easily" met the other licensure

requirements, such as completing an emergency procedures plan, is insufficient to show that she met all requirements to be a foster parent other than M.C.L. 722.115(3) and the administrative code provisions listed in the Report. Although the safety concerns cited by the State were not stated as the reason for denial, it is still Metcalf's burden to establish that she could meet the program's requirements with a reasonable accommodation, which she has failed to do. *Mbawe*, 751 F. App'x at 839. In any case, her proposed accommodation was not reasonable, so she would not have been "otherwise qualified" for licensure—as discussed next.

A significant point of contention is whether Metcalf proposed a reasonable accommodation. The State contends that, based on the information before it at the time of Ennis' recommendation, it found Metcalf's proposed accommodation of using her aides unreasonable. ECF No. 65-2, PageID.1930-31, ¶ 9. The evidence demonstrates that DCWL assessed the information provided to it regarding Metcalf's disabilities and the possibility of accommodation. For example, Neitman's affidavit states that:

> DCWL assessed whether Metcalf could safely provide care with her individual aids. DCWL determined that, without additional information about the aids, including background checks, that was not forthcoming from Metcalf based on the information provided from Ennis, the aids were not a reliable alternative to care for foster children that would be placed in her home. Without

> any information to ensure that there was an adult (1) dedicated to providing for the physical needs of any foster child in the home and (2) who would be subject to the background checks and other safety requirements to ensure that the adult was able to appropriately care for children and could be held accountable under the foster family home laws, Metcalf's home was simply not appropriate placement for foster children.

*Id.* The State argues that since Metcalf's application does not list her aides as co-applicants, DCWL could not enforce licensure requirements against them or ensure that they would provide a safe home for prospective foster children. *Id.*; *see also* ECF No. 60-3. Moreover, Curtis testified that "[i]f Ms. Metcalf intended to have her aids (sic) assist her with caring [for] the foster children, then each aid (sic) would have been required to apply and be accepted as licensed foster parents." *See* ECF No. 63-3, PageID.1529, ¶ 24. Metcalf's testimony also demonstrates that managing her own care is of a changeable and flexible nature—from the amount she pays her assistants, how she pays her assistants, what their shifts are, and who her assistants will be, whether skilled care, family, or friends. ECF No. 60-9, PageID.1444-46. Indeed, Metcalf disclosed 23 individuals that acted as her aides. ECF No. 63-16, PageID.1689. Subjecting Metcalf's various and transient aides to the application process would surely place a burden on the State and Ennis defendants. This proposed accommodation is

particularly unreasonable considering none of the aides have expressed

interest in applying to become a licensed foster parent. ECF No. 63-3.

The State and Ennis defendants offer other evidence to support its

contention that Metcalf's accommodation was unreasonable. First, Dr.

Friedman testified that he prescribes Metcalf's aides specifically for her and

that "they should not be assisting any other person," and that "the purpose

of the home care aides is to care for Ms. Metcalf, not anybody else." ECF

No. 60-8, PageID.1385. Metcalf also testified that she does not have formal

contracts with her aides. ECF No. 60-9, PageID.1446; ECF No. 63-4,

PageID.1556. Thus, the defendants contend that there is nothing legally

binding on Metcalf's aides to care for any potential foster children in the

home and it is unreasonable to rely on Metcalf's personal assurances. In

response, Metcalf states that her insurance reimburses her for the 24/7

assistants, and that she can use those assistants "as she deems fit." ECF

No. 72, PageID.2130. However, this statement does not address the

defendants' argument that her assistants are prescribed to care for *her* only

and there is nothing legally binding her assistants to also care for any

prospective foster care children in her home. The Court points out that just

because Metcalf used her aides to assist with childcare in the past does not

make their use in this instance a reasonable accommodation—as Metcalf

did not require licensure and was not subject to the regulatory requirements to care for family members.

Moreover, Metcalf does not address the critical issue noted by the Court in its Opinion and Order on Ennis' motion to dismiss:

> In particular, one critical factual issue may be decisive: whether the home health assistants provided by Metcalf's no-fault automobile insurance are willing and able to take on childcare duties. The state statute under which her insurer provides home health assistants suggests their duties may not extend this far, M.C.L. 500.3107(1)(a), but the answer in this case will depend on the specific arrangement between Metcalf, her assistants and their employer, and her insurer.

ECF No. 23, PageID.234 n.2. Indeed, Metcalf has not presented any evidence demonstrating her aides' willingness to provide childcare to potential foster children or if their duties extend to such care under M.C.L. 3107(1)(a), which requires insurers to pay "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Metcalf argues that she is "financially and legally able to employ assistants for the purposes of providing childcare with or without assistances from her no-fault insurance." ECF No. 72, PageID.2130. But employing assistants exclusively for providing childcare to Metcalf's prospective foster children is not the accommodation she proposed. Rather, her request, if made at all, was limited to her *prescribed* aides providing such care. Even if the Court

considered any potential childcare providers, they would still be subjected to the same licensure requirements.

The Court finds that Metcalf has not presented sufficient evidence to establish a genuine issue of material fact that her proposed accommodation—using her aides to perform the physical tasks associated with being a foster parent—was a reasonable accommodation under the circumstances, or that a reasonable accommodation was possible. Specifically, Metcalf has not shown that her aides are interested in becoming co-applicants on her foster license application; that she provided the necessary information for them to be considered for licensure; that her aides would be capable or willing to be licensed as foster parents; that they are willing to undertake physical caregiving responsibilities for foster children in addition to assisting Metcalf; that her insurance would cover the care of both Metcalf and the foster children; or that any binding arrangement exists requiring them to care for the children. Ultimately, relying on her aides—who are prescribed solely to care for Metcalf—to carry out the physical responsibilities associated with being a foster parent without subjecting them to the licensure requirements applicable to foster family homes does not constitute a reasonable accommodation.

Accordingly, the Court finds that Metcalf has failed to establish the second element of her prima facie case, i.e., that she is otherwise qualified for licensure, with or without accommodation. The defendants are entitled to summary judgment with respect to Metcalf's failure to accommodate claim.

### c. Whether Metcalf's Proposed Accommodation Would Fundamentally Alter the Purpose of the Licensure Program

Moreover, even if Metcalf were to make out her prima facie case, there is no genuine issue of material fact as to whether Metcalf's proposed accommodation would fundamentally alter the purpose of the licensing program. Whether Metcalf's proposed accommodation would be a fundamental alteration is an affirmative defense that defendants bear the burden of proving. 28 C.F.R. § 35.164.3; *see also Hindel v. Husted*, 875 F.3d 344, 348 (6th Cir. 2017). As the Sixth Circuit explained, "it is not enough for defendant to merely allege plaintiffs' proposed remedy undermines [defendants'] interests. In order to prevail on [its] affirmative defense, defendant has the burden of production and persuasion to prove that [plaintiff's] proposed accommodation . . . would fundamentally alter [the challenged state program.]" *Hindel*, 875 F.3d at 348. "[W]here an ADA plaintiff is asking for the waiver of a generally applicable rule, the court's

'focus should be on whether waiver of the rule in the particular case would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Id.* (quoting *Jones v. City of Monroe*, 341 F.3d 474, 480 (6th Cir. 2003)).

The State argues that allowing unlicensed aides to provide care would constitute a fundamental alteration because it would prevent the DCWL from holding them accountable under the CCOA if they failed to protect the foster child. ECF No. 65, PageID.1912. Ennis points out that Metcalf's accommodation would effectively require the DCWL to waive licensure requirements for her aides—who would provide the physical care of prospective foster children on Metcalf's behalf—so that she may obtain a foster family home license. ECF No. 63, PageID.1508. Whether such waiver would be a fundamental change to the licensure program is based on the purpose of the CCOA, which is:

> [T]o provide for the protection of children through the licensing and regulation of child care organizations; to provide for the establishment of standards of care for child care organizations; to prescribe powers and duties of certain departments of this state and adoption facilitators; to provide penalties; and to repeal acts and parts of acts.

M.C.L. Act 116 of 1973.

Metcalf counters that the DCWL could hold her accountable for her aides' conduct. ECF No. 72, PageID.2141. However, the Court finds that

asking the DCWL to waive licensure requirements for Metcalf's numerous
and rotating aides would effectively require it to abandon its interest in
ensuring that all individuals providing care to the foster children—even
physical care only—are adequately qualified to do so. Indeed, Ennis
presented unrebutted proof that Metcalf's assistants did not apply for
licensure or express interest in doing so, and argues that it would be a
fundamental alteration of the program to have uninterested individuals, who
are prescribed solely to care for Metcalf, to perform that physical tasks
associated with parenting. ECF No. 63-3; ECF No. 63, PageID.1509-10.
Alarmingly, Metcalf testified that she would not provide extra compensation
to her aides for providing additional care to foster children and does not
believe it would increase their responsibilities. ECF No. 63-4, PageID.1564.

The Court rejects Metcalf's assertion that her accommodation is just
"a foster licensee employing others to provide domestic services that
benefit foster children." ECF No. 71, PageID.2081. This is not a situation
where Metcalf is hiring a babysitter for a night out. She is asking that her
aides shoulder *her* responsibility of providing physical care to any
prospective foster children on a 24/7 basis, in addition to the care they
already provide to her. And even if she were to have employees dedicated
to childcare, they would still be required to successfully complete the

licensure process to ensure a safe environment for the children. *See* ECF No. 63-3, PageID.1529, ¶ 24. Metcalf does nothing to rebut this argument—which is fatal to her claim.

The essence of Metcalf's proposed accommodation is that she is not physically able to provide care, supervision, and protection without assistance, and that her aides are necessary for her to meet those requirements. While this does not diminish Metcalf's other qualities as a potential foster parent, the reality is that both she and her aides would all play necessary roles in rendering childcare. Just as Metcalf must meet foster parent licensure standards, her aides—who would share responsibility for care—must also meet those qualifications.  Waiving the essential licensure requirements of the foster care program would undoubtedly operate as a fundamental alteration of the foster care system.[3] As such, it defeats Metcalf's failure-to-accommodate claim against the defendants.

### d.   Individualized Inquiry

---

[3] The Court also notes that Metcalf's reliance on unidentified and transient aides is incompatible with the foster care system's goal of providing a stable environment for the child. *See Tallman v. Milton*, 482 N.W.2d 187, 191 (Mich. App. Ct. 1992).

Turning to the next point, the parties dispute if the State and Ennis defendants conducted an individualized inquiry as to Metcalf's accommodation pursuant to Title II of the ADA. In the context of Title II of the ADA, the Supreme Court has held that when an accommodation has been requested, an "individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). The Sixth Circuit found the Supreme Court's reasoning in *PGA Tour* "makes clear that the individualized inquiry requirement also applies to requests for accommodation under Title II." *Marble*, 767 F. App'x at 652.

Yet a failure to make an individualized inquiry is not necessarily an independent violation of the ADA. The Sixth Circuit has held that a failure to conduct an individualized inquiry "is only an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation," *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014), or "that a reasonable accommodation was possible." *Keith v. County of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013).

However, since Metcalf has not established that she proposed a reasonable accommodation or that a reasonable accommodation would have been possible, defendants were not required to conduct an individualized inquiry.

### 2.  Intentional Discrimination

Metcalf contends that the State intentionally discriminated against her because it accepted Ennis' recommendation to deny her application, initiated a disciplinary investigation against her, and threatened to prohibit her from foster care involvement for five years—all because she was disabled. As it relates to Ennis, Metcalf claims that Curtis' failure to complete the evaluation was due to her disability, the criteria relied upon when assessing her application was discriminatory, and the recommended denial of her application based on her disability constitutes intentional discrimination.

A claim of intentional discrimination under the ADA and/or Section 504 requires the plaintiff to prove that she: (1) had a qualifying disability; (2) was otherwise qualified to participate in the public program, service, or activity at issue; and (3) was excluded from participation in the public program or was discriminated against by the public entity because of his or her disability. *Fritz v. Michigan*, 747 F. App'x 402, 404 (6th Cir. 2018). A

claim under Section 504 of the Rehabilitation Act requires the same

showing except that the plaintiff must prove the discrimination was "solely"

because of the disability. *Id.* Sole causation is not a requirement for a Title

II claim. *Anderson,* 798 F.3d at 357 n.1. The parties do not dispute that

Metcalf has a qualifying disability under the ADA and 504. Rather, the

parties only dispute the second and third element. ECF No. 65.  But as

previously discussed, Metcalf has not met her burden of proving that she

was "otherwise qualified" for licensure with or without a reasonable

accommodation, or that her proposed accommodation would not operate

as a fundamental alteration of the foster care program. Thus, Metcalf's

intentional discrimination claim fails regardless of whether she establishes

a causal nexus.

### a. Causation

The State and Ennis defendants argue that, even if she could

establish that she was otherwise qualified, Metcalf's intentional

discrimination claim fails because she cannot prove that her application

was denied on account of her disability. To successfully bring an intentional

discrimination claim, a plaintiff must show unfavorable treatment based on

her disability. *Knox,* 62 F.4th at 1000. The plaintiff must prove that her

disability caused the defendant's discriminatory behavior—either the "but-

for cause" for ADA claims, or the sole reason for RA claims." *Id.* (citing *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 (6th Cir. 2021)) (citation omitted).

First, the State argues that its decision to administratively close Metcalf's foster care license application was not based on discriminatory animus, but on Metcalf's failure to demonstrate that she could provide a safe home for foster children, which is a neutral licensure requirement to all applicants. ECF No. 65-2, PageID1929, ¶ 7. Specifically, the State cites to Neitman's affidavit, which concluded that Metcalf failed to supply adequate medical documentation or sufficient information about her proposed accommodation, in support of its decision that it could not ensure that Metcalf could safely provide care to foster children. ECF No. 65-2, PageID.1930-31, ¶ 9. The State contends that its failure to approve Metcalf's application was not based on discriminatory animus, as demonstrated by Neitman's testimony:

> At bottom, the reason Metcalf could not provide a safe home was not relevant—rather, the fact that she had not demonstrated she could provide a safe home, in an (sic) of itself, prohibited DCWL from approving the application. There are numerous reasons why an applicant may not be able to provide a safe home; but DCWL ultimately denies applications because they cannot provide a safe home, regardless of the reason.

*Id.* at ¶ 8. Notably, the State did not formally deny the application—an action that would have triggered a five-year ban on licensure—but instead decided to administratively close Metcalf's application, which preserved her ability to reapply. ECF No. 60-3, PageID.1262-63; ECF No. 65-2, PageID.1931, ¶ 11. This undercuts an inference of discriminatory intent. The letter's language to the five-year ban and Disciplinary Action Unit, which Metcalf describes as threatening, was drawn directly from M.C.L. 722.125(4), and does not evidence discriminatory animus. ECF No. 60-3, PageID.1262-63. Furthermore, the State offered Metcalf the opportunity to object to the administrative closure and submit additional information to support her application, which she failed to do. *Id.;* ECF No. 65-2, PageID.1932.

Ennis likewise asserts that discriminatory animus is lacking based on Curtis' testimony, which states that: (1) Ennis followed the same process as any other application, regardless of disability; (2) parts of the application were not completed because Dr. Friedman's medical evaluation revealed that she could not meet the minimum statutory requirements; (3) Curtis' actions were based on the objective requirements for licensure, which Metcalf did not meet; (4) Ennis evaluated Metcalf in the same manner as any applicant who did not meet the minimum licensure requirements. ECF

No. 63, PageID.1504; ECF No. 63-3.  Ennis also argues that Metcalf's own

testimony belies her assertion that Curtis' report demonstrates

discriminatory animus: (1) Curtis helped Metcalf set up her fingerprinting

appointment and Metcalf agreed that Curtis was helping her and

encouraging her to continue the process[4]; (2) Metcalf stated that she had to

meet all of the requirements to get licensure[5]; (3) Metcalf testified that

Curtis was asking questions required by State law, and recording those

answers is not animus towards her disability[6]; (4) Metcalf agreed that the

Ennis defendants should have considered Dr. Friedman's opinion when

making their recommendation[7]; Metcalf selected Dr. Friedman as the

physician to complete the medical evaluation form[8]; and neither Curtis nor

Miller ever discouraged her from trying to obtain her foster care license[9]. In

response to Metcalf's argument that it was discriminatory for Curtis to

complete certain provisions of her application, Curtis testified that:

> Certain portions of Ms. Metcalf's application were left blank as
> they were unnecessary after her treating physician's medical
> examination and report that indicated Ms. Metcalf was physically
> unable to care for a foster or adoptive child and that placing a
> foster or adoptive child would jeopardize the physical or mental

---

[4] ECF No. 63-4, PageID.1559.
[5] Id. at PageID.1561.
[6] Id. at PageID.1562.
[7] Id. at PageID.1565.
[8] Id. at PageID.1566.
[9] Id. at PageID.1569-70.

welfare of any child placed with Ms. Metcalf for foster care and/or adoption . . . This recommendation was in no way intended to discriminate against Ms. Metcalf based on any disability and was based solely on Ms. Metcalf's failure to meet the minimum requirements for foster care licensure . . . Ennis Center would not recommend any applicant that fails to meet the minimum requirements under the administrative code for foster care licensure.

ECF No. 63-3, PageID.1527-28, ¶¶¶ 13, 18, 19.

In addition to their unrebutted proof belying discriminatory animus, the State and Ennis make adjacent arguments that enforcing objective licensure rules does not evidence unlawful disability discrimination. ECF No. 63, PageID.1505; ECF No. 65, PageID.1906. The State cites *Finley v. Huss*, 102 F.4th 789 (6th Cir. 2024) to support its argument that even if Metcalf's disability affects her ability to meet licensing requirements, enforcing those neutral requirements is not intentionally discriminatory.

In *Finley*, the plaintiff, a prisoner, claimed that the deputy wardens discriminated against him by placing him in segregation due to his mental illness. He pursued a direct-evidence theory, asserting that the wardens effectively "admitted" discrimination by basing their decisions on his misconduct—misconduct which, according to his psychiatric expert, stemmed from his mental illness. The *Finley* court rejected this argument holding that a defendant cannot unreasonably deny a plaintiff's requested accommodation to a generally applicable policy and then use that neutral

policy as a purportedly nondiscriminatory basis for taking an adverse action." *Id.* at 823. The court found that the wardens' reliance on Finley's misconduct was not a "smoking gun;" at most, the link between his mental illness and misconduct constituted only indirect evidence of discrimination. *Id.* at 824.

Ennis relies on two out-of-circuit cases to support its position that "requiring medical certification for licensure does not constitute illegal disability discrimination and is not, on its face, evidence of discriminatory animus." ECF No. 63, PageID.1505. In *Theriault v. Flynn*, 162 F.3d 46 (1st Cir. 1998), the First Circuit instructed that "[t]he ADA ... does not protect disabled individuals from all differences in treatment stemming from their disabilities, and it certainly does not require licensing officials to refrain from evaluating safety risks because an applicant appears to be disabled." *Id.* at 50. The First Circuit allowed the New Hampshire Department of Public Safety to require a road test for an individual who appeared to be disabled, without any substantial information that he posed a particular risk to public safety. The court noted that "[w]hen ... symptoms concededly and objectively raise a concern about qualifications ... the public entity properly may engage in an individualized inquiry into whether the person is

nonetheless qualified without shouldering the burden of defending its

'discrimination' as 'necessary.'" *Id.*

Ennis also relies on *Briggs v. Walker*, 88 F. Supp. 2d 1196 (D. Kan.

2000), a case where the plaintiff, who used a wheelchair for mobility,

alleged that the defendant violated the ADA by requiring her to submit a

completed medical certification form before taking the written examination

and obtaining a driving instruction permit under K.S.A. § 8–236. She also

claimed that the defendant enforced this requirement only against

applicants with "visually apparent disabilities," thereby engaging in

discrimination. *Id.* at 1197. The defendant moved to dismiss the case,

arguing that the plaintiff could not allege or prove that she was otherwise

qualified for the instruction permit program, that the medical certification

requirement was not justified by public safety concerns, that she was

denied meaningful access to the program, or that selective enforcement of

the requirement constituted unlawful discrimination. The court ultimately

concluded that the plaintiff could not prove the medical certification

requirement amounted to illegal disability discrimination because "in

balancing the rights of the disabled with its responsibility to ensure safety

on the roads . . . [the state] may ask an applicant to demonstrate that his or

her observable condition will not interfere with safe-driving ability." *Id.* at

1205. Refusing to accept the proposition that "whenever an applicant for an instruction permit appears disabled the state is foreclosed under the ADA from reasonably evaluating the safety risks associated with issuing the permit until the applicant tries for a driver's license," the court found the medical certification form "to be a relatively non-burdensome procedure tailored to elicit certain information needed to make an individualized assessment of an applicant's qualifications." *Id.*

Here, the fact that Metcalf's disability may have contributed to her inability to meet objective licensure requirements does not mean the defendants acted in a discriminatory manner by enforcing those requirements. To be considered for licensure, Metcalf was required to submit a medical certification pursuant to M.C.L. 722.115(3). This Court agrees with the First Circuit's reasoning and applies it here to find that it is not discrimination for the defendants to require, and rely upon, a statutorily mandated medical certification of Metcalf's inability to safely provide for foster children when the possible threat to safety was clearly observable and not based on stereotypes. Defendants must follow CCOA's statutory scheme to protect foster children and ensure that all applicants can provide a safe home to foster children, regardless of their disability. To ask the defendants to ignore these objective requirements just to avoid appearing

discriminatory would surely jeopardize foster children's safety. Therefore, Metcalf cannot establish that her disability was the but-for or sole cause of Ennis' recommendation to deny her application, or the State's decision to administratively close her application.

### b. Did the Defendants Have a Legitimate, Nondiscriminatory Reason to Administratively Close Metcalf's Foster Care License?

Even if Metcalf were to establish a prima facie case of intentional discrimination, the defendants presented a legitimate, non-discriminatory reason for Ennis' recommendation and the State administratively closing her application—that Dr. Friedman's testimony and physical examination states that Metcalf is not physically capable for caring for foster children. ECF No. 60-8, PageID.1386; ECF No. 60-3, PageID.1235.

If Metcalf makes out a prima facie case, "the burden shifts to the [defendants] to offer a legitimate, nondiscriminatory reason for its actions." *Gohl v. Livonia Pub. Schs.*, 836 F.3d 672, 683 (6th Cir. 2016) (citations and internal quotation marks omitted). Once a legitimate reason for the challenged action has been shown, as here, Metcalf must then provide sufficient evidence of a pretext for unlawful discrimination by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the

challenged conduct." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (quoting *Dews v. A. B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Metcalf does not present any proof establishing pretext. Therefore, the defendants are entitled to summary judgment on Metcalf's intentional discrimination claim.

### C. Summary of Metcalf's ADA and Section 504 Claims

For the stated reasons, the Court grants the State and Ennis defendants' motions for summary judgment as to Metcalf's ADA and Section 504 claims against them. Because the Court finds that no genuine issue of material fact exists as to Metcalf's claim that the State violated Title II of the ADA, the Court does not need to determine whether the State is entitled to sovereign immunity. *See Babcock v. Michigan*, 812 F.3d 531, 539 (6th Cir. 2016) (explaining that, without having "identif[ied] ADA-violating conduct, [the Sixth Circuit could not] hold that Congress abrogated the states' sovereign immunity by a valid exercise of its power under § 5 of the Fourteenth Amendment").

### D. Facial Challenge

Metcalf argues that a statutory provision and rule governing the licensing of prospective foster parents violates the ADA and Section 504 on their face, because they exclude people with disabilities from becoming

foster parents and do not allow for any individualized consideration of whether the treatment or adaptive aids relied upon by a person with a disability could adequately mitigate any risks to the child. ECF No. 42, PageID.726-29.

Specifically, Metcalf challenges M.C.L. 722.115(3), which provides that a prospective foster parent may not be licensed unless a doctor certifies that neither the applicant nor anyone in their household "have a known condition that would affect the care of a foster child." M.C.L. 722.115(3). She also challenges one implementing rule promulgated by MDHHS, Michigan Administrative Code Rules 400.9201(d), which states that a prospective foster parent must "[h]ave the physical, mental, and emotional health to ensure appropriate care of children." Mich. Admin. Code R. 400.9201(d).

Under the ADA and Section 504, public entities may not exclude a qualified individual with a disability from participation in services or programs "by reason of such disability," and must evaluate persons with disabilities on an "individualized basis," rather than utilizing criteria or methods of administration "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability[.]" 42

U.S.C. § 12132; *PGA*, 532 U.S. at 690; 28 C.F.R. § 35.130(b)(3)(i), (ii); 45

C.F.R. § 84.4(b)(4)(i), (ii).

However, a facial challenge is a demanding standard. A plaintiff must

establish that a "law is [discriminatory] in all of its applications." *City of Los*

*Angeles v. Patel*, 576 U.S. 409, 418-19 (2015) (citing *Washington State*

*Grange* v. *Washington State Republican Party*, 552 U. S. 442, 449 (2008)).

In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court held

that, for a facial challenge to succeed, a "challenger must establish that no

set of circumstances exists under which the [a]ct would be valid." 481 U.S.

at 745. "Although the Sixth Circuit has not addressed whether the *Salerno*

standard applies to facial challenges brought under the ADA, other courts

have adopted this standard." *Langer v. Individual Members of Tennessee*

*Bd. of L. Examiners*, 2023 WL 5886052, at *3 (E.D. Tenn. Sept. 11, 2023)

(collecting cases).

The State argues, and the record supports, that Metcalf's facial

challenge fails because she cannot establish that M.C.L. 722.115(3) and

Mich. Admin. Code R. 400.9201(d) are discriminatory in all applications.

For example, the DCWL has issued foster family home licenses to

individuals with disabilities, including an applicant who required the use of a

wheelchair, and to individuals who were deaf and had conditions such as

anxiety, depression, and hypertension. ECF No. 65-3, PageID.1937 ¶ 9.
This demonstrates that the statute and rule do not categorically exclude
individuals with disabilities. Metcalf's argument that the provisions fail to
require individualized consideration of adaptive aids or accommodations
mischaracterizes the statutory framework. Nothing in M.C.L. 722.115(3) or
Rule 400.9201(d) prohibits consideration of reasonable accommodations. A
physician may certify that a condition—with or without the aid of reasonable
accommodations—does not adversely affect the ability to care for a child.
*Id.* at ¶ 8. That Dr. Friedman did not consider an adaptive aid when
completing Metcalf's physical examination form does not show that the law
or rule forecloses such consideration in all cases.

At most, Metcalf's argument suggests that the rule and statute may
be applied in a discriminatory manner in *some* cases, but not in all cases.
As such, she fails to meet her burden of establishing that "no set of
circumstances" exists under which M.C.L. 722.115(3) and Mich. Admin.
Code R. 400.9201(d) are valid under the ADA or Section 504. 482 U.S. at
745. Accordingly, the Court grants the State's motion for summary
judgment with respect to Metcalf's facial challenge claim.

### E. Official Capacity Claims

#### 1. Claims against Neitman Are Barred

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 112 S.Ct. 358, 361 (1991) (citation omitted). Therefore, a claim against an official in his official capacity is, by definition, a claim against the official's office. *Will v. Mich. Dep't of State Police*, 109 S. Ct. 2304, 2312 (1989); *see also Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985) (An official-capacity suit "is not a suit against the official personally, for the real party in interest is the entity."). In turn, a former official that no longer holds office cannot be sued in his official capacity. *Durham v. Martin*, 388 F. Supp. 3d 919, 930 (M.D. Tenn. 2019) (citing *Kentucky*,105 S. Ct. at 3105 n.11). Neitman is no longer the DWCL Director, and Metcalf has identified Brotherson as Neitman's replacement and sued her in her official capacity. ECF No.42. Thus, Neitman cannot be sued in an official capacity and claims against her in that capacity must be dismissed.

## 2.  Claims Against Brotherson Are Barred

The Section 504 claim against Brotherson is also dismissed as redundant of claims against the State. Because the official capacity claims are duplicative of the claims against the entity defendant, they may be dismissed as duplicative of the claims against the State. *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) ("Where the entity is named

as a defendant, an official-capacity claim is redundant."); *Doe v. Grandville Pub. Sch. Dist.*, 2018 WL 11507906, at *1 (W.D. Mich. Sept. 6, 2018) (dismissing official capacity claims as duplicative of claims against the entity).

## F. Equal Protection Claim

Metcalf's Equal Protection claims against Neitman and the Ennis defendants also fail. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, "[t]he Equal Protection Clause requires the States (and their subdivisions) to treat like people alike." *Gohl*, 836 F.3d at 684 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); U.S. Const. amend. XIV, § 1). "Disparate treatment based on disability violates the Equal Protection Clause if it lacks a rational relationship to a legitimate governmental purpose . . . . In bringing this claim, [plaintiff] assumed the burden of showing that the defendants intentionally treated [her] differently—because [she] is disabled—than similarly situated [applicants] who were like [her] in all relevant respects." *Id.* (citing *Lane*, 541 U.S. at 522; *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 458 (6th Cir. 2008)) (internal quotations omitted).

Metcalf does not provide any evidence about how *similarly situated* non-disabled applications were treated by Neitman or the Ennis Defendants. She merely claims that individuals without disabilities have been permitted to participate in the Michigan foster licensing program but does not substantiate how these individuals were similarly situated to her in all relevant aspects other than not being disabled. Nor has she pointed to evidence that could persuade a reasonable jury that she did not receive a foster care license because of her disability. Furthermore, Ennis provided unrebutted evidence that it would have recommended denial for any applicant that did not meet the minimum license requirements. ECF No. 63, PageID.1514. The Court agrees with the State's argument that it did not intentionally discriminate against her based on her disability and that regardless, Neitman provided a rational basis for closing Metcalf's license, i.e., that she could not meet licensure requirements. ECF No. 65, PageID.1917.

Accordingly, defendants are entitled to summary judgment as to Metcalf's Equal Protection claim and the Court does not need to assess whether Neitman is entitled to qualified immunity as a result.

## V.    Metcalf's Motion for Summary Judgment

Metcalf also moved for summary judgment on all of her claims, ECF No. 60, and incorporated her motion's arguments into her opposition briefs to the defendants' respective motions. See ECF Nos. 71, 72. The analysis above makes it clear that Metcalf's motion for summary judgment should be denied in its entirety.

## VI.    Conclusion

For the above reasons, the Court **GRANTS** the Ennis Defendants' motion for summary judgment (ECF No. 63), **GRANTS** the State Defendants' motion for summary judgment (ECF No. 65), and **DENIES** Metcalf's motion for summary judgment (ECF No. 60). Metcalf's complaint is **DISMISSED** in its entirety.

**IT IS SO ORDERED.**

s/ Shalina D. Kumar
SHALINA D. KUMAR
Dated: September 30, 2025          United States District Judge